UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| RAYMOND E. FONTAINE TRUST, et al., | )<br>)<br>) Civil Action No. 08-220-ART |
| Plaintiffs, | )<br>) |
| v. | ) **MEMORANDUM OPINION**<br>) **AND ORDER** |
| P & J RESOURCES, INC., et al., | )<br>) |
| Defendants. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The plaintiffs filed a motion for summary judgment, R. 79, to which the defendants responded, R. 87, and the plaintiffs replied, R. 88. After a telephonic motion hearing, the Court ordered the parties to submit supplemental briefing on the issues of waiver, statute of frauds, and hearsay as they apply to this motion. R. 91. The parties each filed a supplemental brief, R. 92, 93, and a response, R. 94, 95. For the reasons explained below, the Court partially grants, and partially denies the plaintiffs' motion for summary judgment, R. 79,

## BACKGROUND

This is a contract dispute over payments from interests in gas wells in eastern Kentucky. The defendants[1] are: P & J Resources ("P & J"), a Kentucky oil and gas drilling company, Pamela Williams, the sole owner and officer of P & J, and her husband Richard Williams, also

---

[1] The plaintiffs joined CDDL, Inc., as a defendant in this case in their amended complaint. *See* R. 22 (Am. Compl.). CCDL is only involved in Claim X, the plaintiffs' claim for declaratory relief. Therefore, unless otherwise specified, "the defendants" collectively refer to P & J, Richard Williams, and Pamela Williams.

an officer of P & J. R. 48 ("R. Williams Dep.") at 103-05. Raymond Fontaine was a wealthy businessman from Massachusetts that began investing with the defendants in 2002. *Id.* at 348. According to the plaintiffs, the investments totaled over $7,480,000 before Mr. Fontaine's death in 2007. R. 79. at 3. Mr. Fontaine provided the capital for over 60 wells and then was supposed to receive an interest in the wells. R. Williams Dep. at 32-40.

For each well, the defendants conveyed a working interest to Mr. Fontaine through an Assignment. *See, e.g.*, R. 1, Ex. 2 (Circle J. Farms Well No. 4 Assignment); R. 1, Ex. 3 (Circle J. Farms Well No. 5 Assignment). The parties signed a Letter Agreement contract for each of the wells to memorialize the deal. *See* R. 79, Ex. 2 ("Letter Agreements"). Each Letter Agreement was dated the same day as the corresponding Assignment. *See, e.g.*, R. 1, Ex. 1 (Circle J. Farm Wells Nos. 4 & 5 Letter Agreement). The typical Letter Agreement was structured so that Mr. Fontaine would receive 75% of the interest of the well until his initial capital investment was repaid. *Id.* After the capital was repaid, Mr. Fontaine and the defendants would split the interest equally (50/50). *Id.* After executing a Letter Agreement, Mr. Fontaine often directed the defendants to assign the actual interest in the well to one or more of his three daughters, his grandson, a trust, or some other person. R. Williams Dep. at 258, 544-45. Before his death, Mr. Fontaine transferred all of his own interests in the wells to the Raymond Fontaine Trust. R. 79, Ex. 1 (Robert Carlson Aff.) ¶ 7. That Trust, along with the other parties with interests in the wells, make up the plaintiffs in this case. *See* R. 1 (Compl.).

On many wells, the defendants agreed to repay Mr. Fontaine his entire capital investment within 30 months after the well went into production. This was memorialized in the Letter

Agreements with the following language ("30-Month Guarantee"):

> P & J Resources Inc., shall provide you on the anniversary of the thirtieth (30th) month after the wells are placed into production an accounting of the amount you received in the form of production payments. In the event you have not received your total investment on or before the thirtieth (30th) month, as mentioned above, P & J Resources, Inc. shall pay you, on or before the tenth (10th) day following the anniversary date aforesaid, the difference between your investment and the amount paid to you based upon the production of the wells.

Letter Agreements at 1. Many of the agreements also promised to pay Mr. Fontaine based on a production of 100,000 cubic feet of gas per day, containing the following language ("100 MCF guarantee"):

> P & J Resources Inc., shall guarantee to pay you based upon the production of 100,000 cubic feet of gas per day for each well, cumulatively or collectively.

*Id.*

On November 28, 2008, the plaintiffs filed a complaint against the defendants alleging various fraud and breach of contract claims. *See* R. 1 (Compl.). They later amended that complaint to add other fraud claims. *See* R. 22 (Am. Compl.). The instant motion for summary judgment, filed February 19, 2010, addresses only some of their pending claims.[2]

The plaintiffs moved for summary judgment on their breach of contract claims. They argue that the defendants breached the 30-Month and 100-MCF Guarantee provisions by not repaying Fontaine pursuant to the Letter Agreements. R. 79 at 20. The plaintiffs hired an expert to calculate the damages, which appear to be in the millions of dollars. R. 79, Exs. 6, 11. The

---

[2] The plaintiffs have other claims pending that are not part of this motion. *See* R. 1 (Compl.); R. 22 (Am. Compl.). Namely, they claim fraud and conversion because the defendants allegedly falsified production data from the wells and falsified regulatory filings.

defendants admit that Mr. Fontaine was never repaid in full for any of his investments in the wells. R. 87, Ex. B ¶ 8; R. Williams Dep. at 441.

The plaintiffs also wish to collect on a $300,000 loan that Mr. Fontaine lent to P & J. R. 79 at 15; R. 79, Ex. 13 (Letter to Mr. Fontaine re: Loan); R. 79, Ex. 14 (Promissory Note). As security for the loan, P & J assigned five wells to Fontaine. R. 67, Ex. 538. The defendants admit that no payments of interest or principal on the loan have been made. R. Williams Dep. at 901-02. The plaintiffs also seek a declaratory judgment that they are not the owners of CDDL, Inc., a company (owned by the Williams) that operates a landfill on the Williams's property. R. 22 ¶ 619; R 79 at 22.

In the event that the Court finds in their favor, the plaintiffs have also moved for an accounting of assets, R. 79 at 22, for joint and several liability against P & J and Richard and Pamela Williams, *id.* at 23, and moved for judgment under Fed. R. Civ. P. 54(b), *id.* at 34.

## DISCUSSION

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The defendants admit that they have not repaid Mr. Fontaine's investments in full and that they have not repaid the loan amount. Thus, the plaintiffs moved for summary judgment on their breach of contract claims.

**I.  The 30-Month Guarantee and 100-MCF Production Guarantee - Counts II & III**

The plaintiffs' claims center around breach of the various contracts. The plaintiffs argue that the defendants breached the 30-Month and 100-MCF Production Guarantees in the Letter

4

Agreements by failing to pay Mr. Fontaine the money owed him from the gas production. In response, the defendants claim that in 2005, Mr. Fontaine directed P & J to "shut in" the wells and cease production. *See* R. 87, Ex. A ("R. Williams Aff.") at 2 ("On April 7, 2005, Mr. Fontaine directed that P & J should not sell any additional gas to Jefferson Gas so that the sales commission and transportation fees would not have to be paid. As a result, P & J shut in all the gas wells and did not transmit any gas from that point forward."). Thus, the defendants claim they could not have breached the Letter Agreements because the agreements changed; the wells stopped producing under Mr. Fontaine's direction, and without production, the defendants could not pay the plaintiffs. R. 87 at 7-9. "It was well understood that P & J would not be able to comply with portions of the letter agreement relating to the guaranteed payment, due to Mr. Fontaine's actions." R. Williams Aff. at 3. The defendants also state that the plaintiffs have waived their right to bring claims for breach, or alternatively, that they are estopped from bringing the claims. *See* R. 87, Ex. B at 1-2 ("The Defendants contend that they are not in breach of the 100 MCF Guarantee and/or 30 Month Guarantee due to Mr. Fontaine's direction to stop production from the wells on April 7, 2005 . . . and the legal principles of waiver and estoppel.").

In reply, the plaintiffs raise two issues. *See* R. 88. First, they allege that Richard Williams's affidavit contains inadmissible hearsay with respect to the statements made by the declarant, Mr. Fontaine, and that the statements do not fit within any of the hearsay exceptions. *Id.* at 2-5. Second, they claim that the statute of frauds, Ky. Rev. Stat. § 371.010(6), prohibits any oral modifications of the well contracts. *Id.* at 6-7. They also argue that neither waiver nor estoppel applies to their claims. *Id.* at 7-9. As explained below, the statute of frauds prohibits oral

5

modification to the Letter Agreement, and neither estoppel nor waiver precludes the plaintiffs' claims. Thus, the Letter Agreements are enforced as written, and summary judgment is granted in favor of the plaintiffs on the breach of contract issues.

**1. Statute of Frauds**

The plaintiffs claim the statute of frauds prohibits any oral modifications of the Letter Agreements. R. 88 at 7 ("The conveyance or assignment of a working interest in an oil and gas lease constitutes an interest in real estate within the meaning of the statute of frauds." (quoting *Owen v. Dayson*, 562 S.W.2d 647, 648 (Ky. Ct. App. 1977))).[3] The plaintiffs are correct.

Under Ky. Rev. Stat. § 371.010(6), "[n]o action shall be brought to charge any person [u]pon any contract for the sale of real estate, or any lease thereof for longer than one year unless the promise . . . be in writing and signed by the party to be charged therewith." The Assignments and Letter Agreements between Mr. Fontaine and the defendants are in writing, in compliance with the statute of frauds. Any subsequent modifications to those contracts, when they materially affect their terms, must also be in writing. *Farmers Bank and Trust Co. of Georgetown Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 8 (Ky. 2005) ("If the contract is required to be in writing, evidence will not be admitted to prove a subsequent parole agreements which materially modifies the writing; that is, if the subsequent agreement itself is within the statute of frauds, and

---

[3]The plaintiffs also argue that with respect to the 30-Month Guarantee, a separate provision of the statute of frauds applies. Ky. Rev. Stat. § 371.010(7) applies to any agreement that cannot be performed within a year. Since the 30-Month Agreement could only apply after two and a half years, any modification to it would have to be in writing. Since the plaintiffs have correctly established that § 371.010(6) applies, the Court need not consider another section of the statute.

6

of a nature required by law to be in writing." (quoting *Murray v. Boyd*, 177 S.W. 468, 471-72 (Ky. 1915))). Mr. Fontaine's instruction to shut in the wells and stop production would materially change the contracts, because without production P & J could not fulfill the terms of the Letter Agreements. Thus, such a change must be memorialized in writing.

The defendants assert several reasons why the statute of frauds should not apply. First, they argue that the real estate section of statute of frauds applies to interests in a lease, but not to interests in an individual well like Mr. Fontaine's. R. 92 at 1-2. Parties have made and courts have rejected this argument in the past. The Kentucky Supreme Court held that the statute of frauds applies to an agreement to convey a working interest in a gas well. *Barnett v. Hagans*, 445 S.W.2d 839, 842 (Ky. 1969). After acknowledging that an oil or gas *lease* is an interest in real estate subject to the statute of frauds, the defendant in *Barnett* argued—just like the defendants do here—that "a working interest in a gas well is not an interest in real estate." *Id.* at 841. The court disagreed, holding that "the phrase 'working interest' means a portion of the oil and gas that may be produced . . . [t]he working interest which Hagans claims was an integral part of Barnett's leasehold estate. The property embraced by it-gas below the surface and not reduced to possession-was an interest in real estate." *Id.* at 842 (*citing Hammer v. Sanders*, 127 N.E.2d 492 (Ill. App. Ct. 1955); *Arrington v. United Royalty Co.*, 65 S.W.2d 36 (Ark. 1933)). Similarly here, the defendants' argument must be rejected. Under *Barnett*, a working interest in a well and the property below it are part of a real estate interest. The Letter Agreements clearly state that the defendants conveyed a "working interest in each well" to Mr. Fontaine. *See* Letter Agreements at 1; *see also Adkins v. Cornett*, 684 S.W.2d 853, 855 (Ky. Ct. App. 1985) (barring enforcement

7

of an oral contract for an interest in coal production as payment for negotiating a lease); Williams and Meyers, Oil & Gas Law, Vol. 1 § 213.1 ("By the great weight of authority, conveyances of royalty, mineral and leasehold interests are included within the statute of frauds.").

More recently, the Sixth Circuit acknowledged the position of Kentucky courts on this issue. *Colvin v. Magnum Drilling of Ohio, Inc.*, No. 90-6369, 1991 WL 78759, at *4 (6th Cir. May 15, 1991). The Circuit affirmed the district court ruling against the plaintiff in *Colvin*, holding that the contract language did not convey to the plaintiff an interest in the well. *Id.* It noted, however, that had the contract language been sufficient, "the Kentucky statute of frauds would require that the assignment be in writing as a sale or lease of real estate." *Id.* (citing Kentucky law). The interest in *Colvin* was only to use a well as a water disposal—even less like a traditional real estate contract than the interest in this case. The plaintiffs' interest in the production from a well, or the working interest, under Kentucky law is subject to the statute of frauds.

Second, the defendants argue that the Assignments, not the Letter Agreements, convey the interest in real estate to Mr. Fontaine. R. 94 at 1-2. Thus, according to the defendants, the Assignments only, and not the Letter Agreements, are subject to the statute of frauds. This argument also fails.

The Letter Agreements are the focus of this dispute. The statute of frauds applies to "any *contract* for the sale of real estate, or any lease thereof for longer than one year." Ky. Rev. Stat. § 371.010(6) (emphasis added). The Letter Agreements state: "This letter when accepted by you in the space provided below shall constitute our agreement as to the completion of the well . . . ."

Letter Agreements at 1. Mr. Fontaine did not sign the Assignments, and they do not contain any detail on the terms between the parties. The Letter Agreements, on the other hand, are signed by both parties and explain the details of Mr. Fontaine's interest. Each Letter Agreement is dated the same day as the Assignment for the corresponding well, which demonstrates that the two documents were meant as part of a single transaction for a real estate interest.

Since all contracts for an interest in real estate must be in writing, and the Letter Agreements are the central part of the contract, the Letter Agreements are subject to the statute of frauds: they must be in writing, and any modifications to them must also be in writing. Thus, any oral agreements to alter the terms of the Letter Agreements are inadmissible.

**2. Waiver**

The defendants also argue that the plaintiffs waived their right to enforce the Letter Agreements, because they never advised the defendants of their intent to enforce them. R. 87 at 8-9.[4] The defendants are incorrect.

The defendants do not point to any statements by the plaintiffs to demonstrate an express or an implied waiver. Waiver is the "voluntary and intentional surrender or relinquishment of a

---

[4]Despite having been giving additional time to brief this issue, the defendants did not supplement their waiver argument. In fact, it seems that they may have abandoned this argument entirely:
> The Defendants have previously argued that the Plaintiffs had waived their right to enforce the 100 MCF and 30 Month Guarantees in the Letter Agreements. Upon further review it is the position of the Defendants that the Plaintiffs should be estopped from demanding compliance with the guarantees as a result of Mr. Fontaine's statements to shut well production, which was relied upon by the Defendants.

R. 92 at 6.

known right." *Greathouse v. Shreve*, 891 S.W.2d 387, 390 (Ky. 1995) (quoting *Barker v. Stearns Coal & Lumber Co.*, 163 S.W.2d 466, 470 (Ky. 1942). Further, proof of waiver must be "clear and convincing." *Id.* at 391. The fact that the plaintiffs waited to bring their claims does not prove that they waived their rights to do so. The plaintiffs filed their complaint well within the 15-year statute of limitations for breach of contract. Ky. Rev. Stat. § 413.090(2). And, the defendants have put forth no evidence supporting their waiver argument. Thus, the defendants have not met their burden of proving the plaintiffs waived their claims.

### 3. Estoppel

The defendants raise an estoppel defense to the plaintiffs' breach of contract claims. R. 92 at 6. Estoppel is a question of fact to be determined by the circumstances of each case. *Weiand v. Bd. of Trs. of Ky. Ret. Sys.*, 25 S.W.3d 88, 91-92 (Ky. 2000) (citations omitted). When the dismissal of a nonmoving party's equitable estoppel claim is sought via summary judgment, it is the nonmoving party's obligation to "present some evidence to support his theory of estoppel." *Gailor v. Alsabi*, 990 S.W.2d 597, 604 (Ky. 1999) (citations omitted). Because the defendants have failed to show an essential element—bad faith—of their estoppel defense, the defense is rejected.

There are two types of estoppel, promissory and equitable, and the defendants do not explain which they allege. The defendants listed estoppel in their answer, R. 15, and in their response to the motion for summary judgment, R. 87, Ex. B, but did not elaborate until asked to brief the waiver issue. Even then, the entirety of their estoppel argument is one paragraph in their supplemental brief:

> As argued by the Plaintiffs, citing *Codell v. American Sur. Co*. 149 F. 2d 854 (6th Cir. 1945), the party seeking estopple [sic] must show some detrimental reliance upon the statement of the other party. In this case, the Defendants would have never ceased production of the wells if they were not ordered to do so by Mr. Fontaine. When the Defendants did shut down production they were not only affected by their own loss of income from the wells, they certainly had no idea that after the death of Mr. Fontaine, the Plaintiffs would seek to enforce the Letter Agreement guarantees.

R. 92 at 6. These allegations are insufficient to meet either type of estoppel defense.

First, promissory estoppel requires "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance." *Sawyer v. Mills*, 295 S.W.3d 79, 90 (Ky. 2009) (quoting *Meade Constr. Co. v. Mansfield Comm. Elec., Inc.*, 579 S.W.2d 105, 106 (Ky. 1979)). Although the defendants allege detrimental reliance, they never reference any promise made by Mr. Fontaine or any other plaintiff. Thus, any potential promissory estoppel defense would not pass muster based on the facts of this case. The elements the defendants must show for the second type, equitable estoppel, are:

> (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;
> (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and
> (3) knowledge, actual or constructive, of the real facts.

*Sebastian-Voor Prop., LLC v. Lexington-Fayette Urban County Gov't,* 265 S.W.3d 190 (Ky. 2008) (citations omitted). Other cases have emphasized the requirement of bad faith intent that runs through these elements. *See Gailor*, 990 S.W.2d at 604 ("In order to prevail on a theory of

11

estoppel, there must be proof . . . of an intent to induce inaction on the party to be estopped") (citation omitted); *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952) ("Under either statutory or equitable estoppel, however, the representation, or act, intentional or otherwise, must have been calculated to mislead or deceive and to induce inaction by the injured party."). The defendants ignore this bad faith element.

The plaintiffs point out that the defendants fail to show evidence of bad faith intent, fail to show that the defendants relied on Mr. Fontaine's statements,[5] and therefore cannot succeed in an estoppel defense. *See* R. 95 at 5-7. Thus, as the movants on the summary judgment motion, the plaintiffs have met their burden of showing deficiencies in the defendants' argument. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Then, the burden of production shifts and Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Id.* at 324. The defendants have completely failed in this respect. The defendants do not argue, nor do they even mention, bad faith in their estoppel argument. *See* R. 92 at 6. They do not address the possible intent of Mr. Fontaine at all. They fail to cite a single fact other than Mr. Fontaine's statements, and they fail to show any connection

---

[5]The defendants' own behavior must also meet certain elements to succeed on an estoppel claim. The defendants must show "reliance, in good faith, upon the conduct or statements of the party to be estopped." *Mourtadier v. Ky. Ret. Sys.*, 2010 WL 1132552, at *4 (Ky. Ct. App. Mar. 26, 2010) (citations omitted). The Court need not reach this issue because the defendants already fail on the lack of evidence of the plaintiffs' bad faith. If it did, however, the defendants also fail to prove that they relied on Mr. Fontaine's statements in shutting down the wells. Although Richard Williams states that P & J shut down the wells based on Mr. Fontaine's statements, R. Williams Aff. at 2, P & J gave other individuals different reasons for shutting down the well production. They blamed the shutdown on a flood or bad weather, *see* R. 88, Ex.1 (Letter to Joan Casartello), and often called the shutdown temporary in nature, *see* R. 88, Exs. 2, 3.

12

between his statement to shut in the wells and the claims filed in this lawsuit.

For the reasons explained above, the defendants have failed to meet their burden, and thus their estoppel defense must be rejected at the summary judgment stage. "Estoppel is a doctrine of equity, and equitable relief may be granted to relieve the harsh effects of the statute of frauds." *Willmott Hardwoods*, 171 S.W.3d at 10 (citations omitted). Therefore, the estoppel exception should only be applied "under the most limited of circumstances, lest the Court run afoul of judicially amending the statute in violation of separation of powers." *Id.* (citation omitted). This is not one of those limited circumstances. Since the defendants admit that they have not paid the plaintiffs pursuant to the written Letter Agreements, and have not presented a valid defense to the claims, the Court grants summary judgment for the plaintiffs on the breach of contract claims.

### 4. Hearsay

The plaintiffs also argue that Mr. Fontaine's statements are inadmissible hearsay. R. 88 at 2-5. The Court need not reach this issue since even considering the statements, summary judgment is appropriate for the reasons given. The statute of frauds prohibits use of the statements as a breach of contract defense. And since the defendants' estoppel claim fails out of the gate, the Court need not consider any possible reliance on the statement.

## II. The $300,000 Loan - Count V

The plaintiffs have also moved for summary judgment on another breach of contract claim, this one based upon Mr. Fontaine's Loan Agreement with P & J. Mr. Fontaine lent P & J $300,000 in 2004 to construct Section 8 Housing and Urban Development apartments. *See* R. 79, Ex. 13 (Letter to Fontaine re: Loan); R. 79, Ex. 14 (Promissory Note). The defendants admit that

13

they have made no payments of interest or principal on the loan. R. Williams Dep. at 901-02. They believe, however, that they have repaid the loan in full based on an oral modification. R. 87 at 6. The defendants claim, again based on Mr. Fontaine's conversations with Richard Williams, that Mr. Fontaine stated that he did not want repayment of the loan. R. Williams Aff. at 4. According to Williams, Mr. Fontaine wanted the five wells that were pledged as security rather than the $300,000 as repayment. *See id.* ("[Mr. Fontaine] indicated that he did not want the money back, but indeed would rather keep the five wells as security for the loan."). The defendants do not submit any written proof of this modification.

Again, the statute of frauds applies; this time, a separate section for loan agreements. "No action shall be brought to charge any person [u]pon any promise, contract, agreement, undertaking, or commitment to loan money, to grant, extend, or renew credit, or make any financial accommodation to establish or assist a business enterprise or an existing business enterprise unless the agreement . . . is in writing." Ky. Rev. Stat. § 370.010(9).

Further, the defendants assigned an interest in gas wells as security for the loan. The Loan Agreement reads: "In consideration of your advancing the sum of Three hundred thousand dollars ($300,000.00) loan Resources, as additional collateral, shall assign five wells to Raymond Fontaine. You shall receive fifty percent (50%) of eighty-one and one-half percent (81.5%) *working interest* in these wells." R. 67, Ex. 538 (emphasis added). Thus, the statute of frauds analysis applied to the statements that would modify the 30-Month and 100-MCF Guarantees apply to Mr. Fontaine's statements modifying the Loan Agreements as well. *See Barnett v. Hagans*, 445 S.W.2d at 841-42 (a working interest in a well qualifies as a real estate

interest/contract for statute of frauds purposes). Therefore, the statute of frauds bars the consideration of these statements as modification to the Loan Agreement.

The defendants list the same estoppel and waiver defenses to the Loan Agreement that they argued for the Letter Agreement claims. As explained above, neither of these arguments is fully developed, and thus they fall short. Because the defendants have not repaid the principal or the interest on the loan to Mr. Fontaine, and fail to prove any change to that Loan Agreement, summary judgment is granted in favor of the plaintiffs on this claim.

### III. CDDL - Count X

The plaintiffs seek a declaratory judgment that they are not the owners of CDDL, a company (owned by the Williamses) that operates a landfill on the Williams' property. R. 79 at 22. It is not clear from the complaint or motion why this is relevant, but the defendants agree that none of the plaintiffs have any interest in this entity. R. 87 at 9. Thus, summary judgment is appropriate on this claim.

### IV. Joint & Several Liability/Pierce the Corporate Veil - Count IX

Now with a breach of contract judgment in hand, the plaintiffs have already anticipated collecting damages from P & J. They seek to hold Pamela and Richard Williams personally liable by piercing the corporate veil, and have moved for summary judgment on this claim. R. 79 at 23-34. The decision whether to pierce the corporate veil is an equitable one for the court—not the jury. *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 213 (Ky. Ct. App. 2009). For the reasons explained below, the plaintiffs have not shown that the Court must pierce P & J's corporate veil at this time.

The plaintiffs want to pierce P & J's corporate veil because "P & J is nothing more than the alter ego or instrumentality of Mr. and Mrs. Williams."[6] R. 79 at 23. Kentucky law instructs courts to pierce the corporate veil "reluctantly and cautiously." *White v. Winchester Land Dev. Corp.*, 584 S.W.2d 56, 62 (Ky. Ct. App. 1979). "The corporate veil should not be pierced unless there is (1) 'such a unity of ownership and interest' that the separate personalities of the corporation and its owner cease to exist, and (2) 'the facts are such that an adherence to the normal attributes . . . of separate corporate existence would sanction a fraud or promote injustice.'" *Hodak v. Madison Capital Mgmt., LLC*, 348 F. App'x 83, 95 (6th Cir. 2009) (quoting *Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 847 (W.D. Ky. 2007)). The plaintiffs put forth a great deal of evidence to prove the "unity of ownership and interest" between P & J and the Williamses. *See* R. 29 at 23-29. They must also show, however, a link between the abuse of the corporate form and a fraud or injustice caused to them. "Absent evidence of some fraud or injustice resulting *directly* from the abuse of the corporate form, 'the specific, unusual circumstances' necessary to justify piercing the corporate veil are lacking." *Hodak*, 348 F. App'x at 95 (citations omitted) (emphasis added). This is where the plaintiffs' argument fails.

The plaintiffs have offered proof that the Williamses failed to observe legally required

---

[6]Kentucky law provides different theories under which shareholders can be found liable for corporate liabilities: the equity formulation, the alter ego theory, and the instrumentality theory. *White v. Winchester Land Development Corp.*, 584 S.W.2d 56, 61 (Ky. Ct. App. 1979). The plaintiffs argue based on all three theories. *See* R. 79 at 23-34.

16

corporate formalities in their governance of P & J. *See* R. 79 at 25-32.[7] But they have neither (1) shown that the Williamses caused them a fraud or injustice, nor (2) linked this abuse of the corporate form with their injury. First, the plaintiffs have not proved fraud or injustice—on this motion, they have only proved breach of contract. The plaintiffs do have a fraud claim pending in this case. R. 22 at 89-116 (Am. Compl. Count VI). They attempt to link the facts they allege on that claim to the Williamses' misuse of P & J. R. 79 at 24-25. However, the plaintiffs have not moved for judgment on the fraud claim, and the Court is not prepared to address fraud arguments at this time. The only other injustice that the plaintiffs allege is that they are unlikely to recover the amount owed from P & J. *Id.* at 33-34; R. 88 at 11-12. However, difficulty in collecting a judgment is not reason enough to disregard corporate protections and reach into the Williamses' personal assets. "[T]he corporate veil may not be pierced without a showing of injury caused by fraud or injustice separate and apart from the defendant corporation's inability to pay its debt." *Scarbrough v. Perez*, 870 F.2d 1079, 1084 (6th Cir. 1989); *see also Sudamax*, 516 F. Supp. 2d at 849 (citations omitted). Thus, the plaintiffs have not proved a fraud or injustice.[8]

---

[7]Whether looking at the equity, alter ego or instrumentality theory, the mandated factors of the equity formulation "are considered in all the cases no matter what 'test' is being applied." *White*, 584 S.W.2d at 62. These factors shed light on the lack of separation between the corporation and its owner: (1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4) a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities." *Id.*

[8]Actual fraud itself is not required to pierce the corporate veil. *See, e.g., United States v. WRW Corp.*, 778 F.Supp. 919, 923-24 (E.D. Ky. 1991) (piercing the corporate veil because the individual defendants' actions taken without board approval led to an accident and subsequent judgment against the corporation); *see also Bear, Inc. v. Smith*, 303 S.W.3d 137, 148 (Ky. Ct. App. 2010) ("while we have determined that no fraud has occurred under the circumstances of

Second, the plaintiffs cannot link their injury to the defendants' misuse of the corporate form. Currently, their only proven injury is breach of the well and loan agreements. The plaintiffs' situation mirrors that of the plaintiff in *Hodak*. 348 F. App'x at 95-96. Hodak had only a breach of contract claim against the defendants, and "admitted that he [was] unaware of any way in which the defendants' corporate structural formation harmed him." *Id.* at 95-96. Without this connection, the court refused to pierce the corporate veil. *Id.* at 96. Similarly here, the plaintiffs have not shown that the Williamses' alleged abuse of P & J's corporate form caused the breach of contract. P & J breached its contracts with the plaintiffs because it admittedly failed to pay Mr. Fontaine the return on his investment and the debt on the loan. As the evidence was presented, this was in no way linked to any misuse of the P & J corporate "shield" to protect the Williamses' from any personal liability based on their actions. It resulted from P & J's simple failure to pay its debt. The Williamses' commingling of their funds with P & J's funds, P & J's failure to keep corporate records as required by law, and its refusal to pay dividends to its shareholder—all alleged by the plaintiffs—did not directly cause the breach.

Like in *Hodak*, the plaintiffs do not meet their burden on veil-piercing by proving breach of contract and alleging misuse of P & J funds. They must connect the two. The contractual injury "has not been shown to be attributable to any use of [P & J's] separate legal identity by the [Williamses] to 'justify wrong, protect fraud, or defend crime.'" *Hodak*, 348 F. App'x at 95 (quoting *Daniels*, 300 S.W.3d at 211). If Richard and Pamela Williams have committed other

---

this case, and while the record fails to demonstrate that the corporate form of Smith Services was used to defend a crime, Laker Express has presented some evidence . . . demonstrating . . . the justification of a wrong.").

18

wrongs against the plaintiffs, the plaintiffs have not related them to the judgment entered today.

Thus, because the record at this time lacks evidence supporting this essential element of the plaintiffs' veil-piercing theory, there are genuine material issues of fact. Summary judgment on the veil-piercing claim is denied.

## CONCLUSION

For the reasons explained above, it is **ORDERED** that the plaintiffs' motion for summary judgment, R. 79, is **GRANTED IN PART** and **DENIED IN PART**:

(1) On counts II & III, the plaintiffs' claims for breach of the 30-Month Guarantee and 100-MCF Production Guarantee, summary judgment is **GRANTED**;

(2) On count V, the plaintiffs' claim for breach of the $300,000 Loan Agreement, summary judgment is **GRANTED**;

(3) On count X, the plaintiffs' claim for a declaration that it is not part of CDDL, summary judgment is **GRANTED**;

(4) On count IX, joint and several liability/pierce the corporate veil, summary judgment is **DENIED**; and

(5) A telephonic conference between the parties and the undersigned is set for **April 22, 2010**, at **2:30 p.m.** The undersigned's chambers shall initiate the conference call, and the lead counsel for each party shall be prepared to discuss the status of the remaining claims. A court reporter is needed and will be provided by the Court.

This the 15th day of April, 2010.

Signed By:
*Amul R. Thapar* AT
United States District Judge